No. 16,681.

CONTINENTAL CASUALTY COMPANY ET AL. *v.* INDUSTRIAL
COMMISSION ET AL.
(238 P. [2d] 196)

Decided September 24, 1951. Rehearing denied December 3, 1951.

Messrs. JANUARY & YEGGE, MARGARET R. BATES, for plaintiffs in error.

Messrs. McCOMB & ZARLENGO, for defendant in error Callen.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. PETER L. DYE, Assistant, for defendant in error Industrial Commission.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

T. J. CALLEN, an employee of Fruehauf Trailer Company, for which the Continental Casualty Company was

an insurer, on August 2, 1947, was injured in an accident arising out of and in the course of his employment. The employer's report to the Industrial Commission, as well as that of the doctor called to attend Callen, indicated that the major injury sustained by the latter was a fractured skull, for treatment of which he was confined in the hospital for about ten days. The insurance carrier admitted its liability at the rate of $17.50 per week and also for any permanent disability thereafter determined to exist. Callen returned to his employment on August 25, 1947, and the attending physician's report contained the statement that there was no permanent disability so far as could be determined on August 26, 1947. According to a letter in the files, on September 4, 1947, Callen executed a final receipt, but the receipt is not to be found therein. June 30, 1950, the employee filed a petition to reopen his claim, accompanied by the report of two physicians, in which petition he complained of injury to his sinuses followed by coughs and headaches, allegedly resulting from the injury. On July 20, 1950, the Industrial Commission entered an order reopening the cause for the purpose of determining whether there had been error, mistake or change in Callen's condition, and on April 2, 1951, after the case had been remanded to it by the district court "to make conclusions of fact and rulings of law" it made its supplemental award, of which the following is a part: "At the time claimant returned to work [August 25, 1947] it was the opinion of his attending physicians that he would sustain no permanent partial disability as a result of his head injury. However, the Commission finds that claimant's disability as a result of his head injury gradually became worse and that claimant now has a permanent partial disability of 25% as a working unit as the result of his fractured skull and that this disability has existed from August 23, 1950, when claimant reached his maximum improvement. * * *

&ast;  &ast;  &ast;

"It is, therefore, ordered: That the respondents pay compensation to the claimant at the rate of $17.50 per week from August 12, 1947 to August 24, 1947, inclusive for and on account of temporary total disability, plus the further payment of compensation at that same rate until the additional sum of $4,274.22 shall have been paid for and on account of permanent partial disability resulting from the claimant's fractured skull."

The district court affirmed the award of the commission, and the employer and insurance carrier bring the cause here seeking a reversal.

It is conceded that Callen's injuries were accidental and were incurred in the course of his employment; that while engaged in work he fell from a "lumber rack" striking his head on a concrete floor resulting in a skull fracture. Callen testified, and his testimony was supported by that of his wife, that prior to the accident he was in excellent health, with no disability whatever, while subsequent to the accident, and almost immediately thereafter, he was bothered by coughing, had lost his sense of smell and taste, was completely deaf in his left ear and his right ear was about twenty-five per cent defective; that he suffered from loss of memory, "dizzy spells," and was nervous and irritable. According to Callen and his wife, these conditions all manifested themselves subsequent to the time of the accident.

Dr. William R. Lipscomb, a specialist in neurosurgery, testified that he had made a complete examination of Callen, with special reference to his neurological system, and, as a result thereof, supplemented by an examination of x-ray pictures, was of the opinion that the claimant had a number of nervous symptoms, lacked ability to do certain parts of the work required of him, had lost his sense of taste and smell, had decreased hearing, and that the permanent partial disability of fifteen per cent as a working unit was the result of the skull fracture incurred in an accident on August 2, 1947.

On cross-examination this witness was questioned and

answered as follows: "Q. If he [claimant] had told you that during this three-year period there was for a time considerable improvement, a lessening of his symptoms, would that change your opinion any? A. Well, yes, but he didn't tell me that, and he has had these symptoms more or less all the time, and as far as I could gather in my questioning that had been about the same—that they had disabled him in the same way that they did in the very beginning. Q. In other words, his history to you was that he has had about the same symptoms throughout this entire period, and it is on his history, plus your objective findings that you base your opinion? A. That is correct."

This witness was not interrogated, nor did he answer, as to whether temporary cessation of claimant's disabilities would, in his opinion, increase or decrease claimant's permanent disability, and as to this we are left to conjecture.

Dr. C. G. Freed, a specialist in neurological surgery, was called as a witness by respondents. He testified that he had examined claimant on December 11, 1947, and reported thereon, and subsequently, on August 7, 1950, had made another examination and made a report. This witness, according to his December 11, 1947, report, concluded that some of the symptoms of which Callen complained "are residuel of a concussion of the brain"; that he believed that claimant's condition would improve; and that in his opinion there would be no permanent disability attributable to the accident. At the time of this report Callen complained of *headaches* and *dizziness*. On August 7, 1950, when this witness re-examined claimant and reported the result thereof, he concluded, "At the present examination, there is x-ray and clinical evidence to indicate that this claimant is suffering from a cerebellopotine angle tumor or a tumor of the left acoustic nerve. I believe his present neurological complaints, particularly as regards loss of hearing and the noises in the left ear, are due to this condition rather

than to the injury of August *10*, 1947. The loss of sense of smell and flavor of which he complains may be due to the alleged injury of August *10*, 1947. This symptom, in itself, should not in my opinion constitute significant industrial disability. The other neurological symptoms which I feel are due to the presence of tumor are constituting cause for industrial disability. Surgical removal of the tumor will probably become necessary in the future."

This witness further testified that on his examination of August 7, 1950: "His [Callen's] complaints referable to the nervous system at the time I saw him— that is, on August 7, 1950—consisted principally of loss of hearing in the left ear, noise in the left ear, *spells of vertigo* on change of position, loss of *taste and smell and occasional headaches*." (Emphasis supplied) It was the witness' opinion that the loss of hearing and the noises in his ear, as well as some of the other complaints that he, claimant, had at this time were probably due to the presence of this tumor. Q. You attribute them to the tumor rather than to the injury of August, 1947? A. Primarily, yes. The complaints of *loss in taste and smell* I am a little confused about myself because I don't know whether they are referable to the injury or whether they are referable to the sinus disease that he has had and subsequent brain abscess. You can't say which they are due to with any certainty. It is possible those particular complaints *could have been due to the injury* but they are not due to the presence of the acoustic nerve tumor. Q. Do you have any opinion, Dr. Freed, as to the cause of the acoustic nerve tumor? A. No, it isn't known what the cause of these tumors are. They are slow growing fibrous types of tumors and *benign. It is conceivable, I think, that injury or trauma may conceivably play a role in this particular type of tumor.* Q. What is your recommendation as to treatment, if any? A. Well, because these tumors are rather slow growing, it is just as well to wait until they get more

disabling symptoms *and then surgery is the only treatment*. This man is still working and able to work, and for that reason I feel it would be just as well to wait until he gets more disability than he has now before recommending surgical removal of this tumor. Q. *Would you anticipate that the disability will increase from that source?* A. Yes." (Italics ours)

On cross-examination this witness testified: "Q. This man definitely had a skull fracture at the time of his accident? A. According to the x-rays, yes, sir. Q. Are you able to state whether or not he had any *brain injury* at the time? A. Well, assuming that his history is correct that he was unconscious for ten or fifteen minutes, *he would have to sustain some injury.* * * * Q. Do you feel that the symptoms of *headache* and *dizziness* are a result of brain injury? A. They can be. Q. Usually after a brain injury you do have symptoms of that type, don't you? A. Well, *they are rather common, yes, sir."* (Italics ours)

With reference to the cause of the tumor which might occasion the disability of which claimant complained, this witness testified: "I feel certain that his progressive loss of hearing, which is bona fide, and which he has had are, in my opinion, due to the presence of a tumor of this nerve. As I stated, *I don't think anyone can say positively the relationship between this accident and the development of this tumor. It is possible that a small tumor may have been present at the time he got hurt. It is also possible that a certain amount of hemorrhage and reaction around this nerve as a result of the injury may have started the formation of a tumor. I think it is one of those questions that can't be answered."* (Italics ours)

On redirect examination we find the following in the record: "Q. As far as the relationship between the tumor and the injury of August, 1947, would you say that there is a *possible relationship between the presence of the tumor and the accident?* A. *Yes, I think there is,*

and I say that for this reason: This type of tumor belongs to the group of tumors that is called fibrous tumors, a very similar pathological type of tumors, *and it has been fairly well established that that particular type of tumor sometimes has trauma as a predisposing factor.* There are other types of tumor that I don't think there is any question about trauma playing a part in the production, *but this particular type there is a likelihood that trauma plays a part.*" (Italics ours) This witness called by respondent employer testified that from the last examination on August 7, 1951, it was his opinion that from a neurological standing claimant had a twenty-five per cent disability as a working unit, and that this disability would increase as time went on until claimant might eventually be one hundred per cent disabled.

The specifications of points are: "I. The finding that the accident caused permanent partial disability is not supported by substantial creditable evidence. II. Even if there were sufficient competent evidence to support the Commission's finding as to the cause of the claimant's disability, there is none to support its finding that he has 25% permanent partial disability from August 23, 1950 and that he reached his maximum improvement on that date."

We have quoted somewhat at length from the evidence in behalf of Callen, and testimony of a physician called in his behalf, as well as that of a physician called to testify in behalf of respondents. We have read the entire record for the purpose of ascertaining whether there was competent evidence before the commission from which it might reasonably find, as it did, that the disabilities of which Callen complained at the hearing on August 23, 1950, were caused by, and resulted from, injuries sustained by him in the accident occurring on August 2, 1947. It was Dr. Freed's opinion on August 7, 1950, the date of his last examination of claimant, that claimant's disability as a working unit was twenty-five per cent, and that this disability would increase as time

progressed; that claimant's disabilities, or some of them, are directly chargeable to the injuries sustained by him in the accident on August 2, 1947; and that other disabilities of which he complains may all be referable to those sustained in that accident.

There is sufficient competent evidence in the record, in addition to that herein stated, to support the commission's supplemental award; consequently, it was the duty of the district court to affirm such award; and it is our duty to affirm the judgment of the district court. We deem the citation of authorities to support our disposition of the case wholly unnecessary.

The judgment is affirmed.